IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01118-KLM

MILLENNIUM, INC., a Colorado corporation,

      Plaintiff,

v.

SAI DENVER M, INC., a Colorado corporation,

      Defendant.

_____

## ORDER

_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendant's **Motion and Memorandum Brief in Support of Motion for Summary Judgment** [#32][1] (the "Motion"). Plaintiff filed a Response [#33] in opposition to the Motion, and Defendant filed a Reply [#34]. The Court has reviewed the Motion, the Response, the Reply, the entire case file, and the applicable law and is sufficiently advised in the premises.[2]  For the reasons set forth below, the Motion [#32] is **GRANTED in part** and **DENIED in part**.

---

    [1]  "[#32]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

    [2]  The case has been referred to the undersigned for all purposes [#21] pursuant to the Court's Pilot Program and 28 U.S.C. § 636(c), upon consent of the parties [#20].

# I. Summary of the Case[3]

## A.   Background

This case concerns a copyright infringement and contract dispute between Plaintiff, a video production company, and Defendant, doing business as Mercedes-Benz of Denver, which operates a car dealership.  *Motion* [#32] at 1-2; *Response* [#33] at 6.

In October or November of 2013, Michael Hupfer ("Hupfer"), Plaintiff's President, and Larry Stanley ("Stanley"), Defendant's general manager from August 2013 until January 2014, met to discuss the production of a television advertisement for Defendant. *Response*, *Attach. 1* [#33-1] at 8-9 (Stanley Dep. at 11-12).  Mr. Stanley showed Mr. Hupfer a proposal from another company to make the advertisement, and Mr. Hupfer responded by saying, "Let me just make this sweeter; I'll produce a completely finished spot for you on spec; if you don't like it, you don't pay for it, but if you like it, you pay for it, you can use it."  *Id.* at 18 (Hupfer Dep. at 35).  "[Those] were the exact words [Mr. Hupfer] used with [Mr. Stanley].  [They] agreed."  *Id.* at 18 (Hupfer Dep. at 35).  Plaintiff maintains that when they met, "Mr. Stanley showed Mr. Hupfer an estimate [from another company] for creation of an ad *concept* as distinct from a ready-to-air television advertisement." *Response* [#33] at 6 (citing *Response, Attach. 1* [#33-1] at 8 (Stanley Dep. at 11)).

Plaintiff produced a copyrighted work for Defendant titled "Indulge" ("Indulge," the "Ad," or the "Work").  *Motion* [#32] at 3; *Response* [#33] at 6.  Plaintiff complied with the statutory formalities for the registration of a copyright, and registration of the Work became effective in March 2014.  *Am. Compl.* [#6] at 3; *Answer* [#17] at 3.  The completion of the

---

[3]   The following summary construes the evidence in the light most favorable to Plaintiff, as the nonmovant.  *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184,1186 (10th Cir. 2015) ("[We . . . recite] all summary-judgment evidence in the light most favorable to [plaintiff] as the nonmovant.").

Ad and its delivery to Comcast were time-sensitive, in order to meet the Comcast media purchase made on behalf of Defendant by EMICO, the media buyer for Defendant. *Motion* [#32] at 3; *Response* [#33] at 6; *Motion, Attach. 4* [#32-4] at 2-3 (emails between Mr. Hupfer and Natalie Mansi ("Mansi") of EMICO); *Response, Attach. 1* [#33-1] at 14-15 (Hupfer Dep. at 21-22). In December 2013, Defendant "approved the [W]ork and reiterated its approval of that [W]ork on December 12, 2013," without discussion or agreement regarding how much the Ad would cost. *Motion* [#32] at 3; *Response* [#33] at 6; *Response, Attach. 1* [#33-1] at 10-11 (Stanley Dep. at 19-20). Plaintiff delivered the copyrighted Work to Comcast for broadcast. *Motion* [#32] at 3; *Response* [#33] at 6. Significant technical issues with the Ad required email exchanges between Plaintiff and Comcast, and no employee from Defendant was copied on those emails. *Motion* [#32] at 4; *Response* [#33] at 6. The Ad was publicly performed on Comcast networks 592 times between December 12, 2013, and December 31, 2013. *Motion* [#32] at 4; *Response* [#33] at 6. Plaintiff first sent an invoice for the Ad to Defendant on March 14, 2014. *Motion* [#32] at 4; *Response* [#33] at 6. This invoice expressly stated that the invoice acts as a license agreement and that "payment in full is required in order to receive full clearances on proprietary materials embedded in this work." *Motion* [#32] at 4-5; *Response* [#33] at 6. Plaintiff notes that the March 14 "invoice serves as clearance when payment is properly remitted." *Id.* at 7. Plaintiff also notes that "the courtesy of making a license retroactive was extended to Murray Motors [previous owner of Defendant] many times *because Murray Motors timely paid* the invoice that granted them a license to use works created by [Plaintiff]." *Id.* at 7 (citing *Response, Attach. 1* [#33-1] at 13 (Hupfer Dep. at 19)).

Before sending the invoice on March 14, 2014, Mr. Hupfer called and emailed Mark

Harvey ("Harvey"), the general manager of Defendant, leaving a voicemail on February 21, 2014, and sending an email on February 26, 2014. *Scheduling Order* [#24] at 5 (undisputed facts). Mr. Harvey called Mr. Hupfer on March 4, 2015, and Mr. Harvey requested a signed copy of any contract before paying Plaintiff for the Ad. *Id.* In the March 4 conversation, Mr. Hupfer asserted that the Ad was aired without a license agreement and that he would like to resolve the copyright license issue he believed to exist. *Id.* The March 14 invoice for the Ad had not been paid by April 1, 2014, and Mr. Hupfer again emailed Mr. Harvey. *Id.* Mr. Harvey responded on April 1 to Mr. Hupfer with an email in which Mr. Harvey reiterated that he "cannot agree to pay an invoice that was not signed or does not have a purchase order issued." *Id.* Plaintiff asserts that it is unclear whether the amount of the invoice was ever in dispute, based on emails from Mr. Harvey to Mr. Hupfer. *Response* [#33] at 7 (citing *Response, Attach. 1* [#33-1] at 2 (email between Mr. Harvey and Mr. Hupfer)).

On April 18, 2014, Plaintiff filed this action seeking damages, costs, and attorneys' fees, asserting a claim alleging copyright infringement for the public performance of a work subject to copyright, a claim alleging breach of contract, and a claim alleging unjust enrichment. *Scheduling Order* [#24] at 2. To date, Defendant has not actually made payments to Plaintiff for the Ad, but has offered payment in full for the March 14, 2014 invoice. *Id.* at 5 (undisputed facts). Defendant admits owing Plaintiff for production of the Ad and has paid Comcast for airing the Ad in December 2013. *Id.* Defendant made an offer of judgment on June 13, 2014, to which Plaintiff did not respond, which was therefore deemed withdrawn in accordance with Fed. R. Civ. P. 68 on June 27, 2014. *Id.* Plaintiff asserts that this offer was not an "unconditional tender" but was "conditioned upon

[Plaintiff's] termination of its copyright infringement claim," and that Plaintiff requested additional information to determine "whether it was in [Plaintiff's] best interest to accept the offer of judgment or the tendered payment" but never received the requested information. *Response* [#33] at 7 (citing *Response, Attach. 1* [#33-1] at 34 (June 17, 2014 letter from Plaintiff's counsel to Defendant's counsel)).   On July 31, 2014, Defendant sent a check to Plaintiff for $10,135 to resolve the March 14 invoice.   *Response, Attach. 1* [#33-1] at 36-37. Plaintiff has not cashed this check or otherwise accepted payment.   *Motion, Attach. 2* [#32-2] at 10 (Hupfer Dep. at 149).   Plaintiff notes that while there are frequently circumstances where a client such as Defendant will air an advertisement before paying for the license, Mr. Hupfer only extends the courtesy to clients who have established a timely pattern of remitting payments to Plaintiff.   *Response* [#33] at 7.

## B.   The Motion

In the Motion, Defendant argues that it is entitled to summary judgment because Defendant did not infringe on Plaintiff's copyright for Indulge because Defendant had an implied license to perform the Ad and, in the alternative, because Plaintiff is estopped from claiming infringement.   *Motion* [#32] at 6.   Defendant also argues that Plaintiff's breach of contract and unjust enrichment claims are moot, and that Defendant is entitled to an award of attorney's fees.   *Id.* at 10.   Overall, Defendant characterizes this case as a dispute regarding payment for the creation of an advertisement and argues that Plaintiff has attempted to "manufacture a copyright violation when none exists."   *Id.* at 1-2.

In the Response, Plaintiff argues that Defendant infringed on Plaintiff's copyright for the Ad because: (1) Defendant concedes that the Ad is a copyrighted work owned by Plaintiff and (2) that Defendant exercised an exclusive right of the copyright owner [i.e.,

Plaintiff] without Plaintiff's permission.   *Response* [#33] at 8-9.   Plaintiff's argument regarding the second element of a claim for copyright infringement is difficult to follow. Plaintiff asserts that "[i]t is undisputed that [Defendant] does not possess a written license to perform 'Indulge,'" the evidence does not show the existence of a nonexclusive use license for the Ad, and that therefore, the exception to the writing requirement for a transfer of copyright for nonexclusive licenses does not apply in this case.  *Id.* at 9.   While Plaintiff accepts that the existence of an implied license is an affirmative defense to copyright infringement, Plaintiff argues that its existence is a "genuine issue of material fact which requires a determination by the Court [at a bench trial] and therefore precludes summary judgment," but cites no law to support this proposition.  *Id.* at 11.   Plaintiff also argues that even if a nonexclusive license existed, Defendant's payment for the Ad was a condition of the agreement between Defendant and Plaintiff, "the non-satisfaction of which resulted in ineffective licensure."   *Response* [#33] at 11.   Regarding the breach of contract claim, Plaintiff argues that Defendant breached its contract with Plaintiff and that Plaintiff has established (1) the existence of a contract, (2) performance on the part of Plaintiff, and (3) Defendant's breach of contract by nonpayment.  *Id.* at 17.   Plaintiff argues that the contract and unjust enrichment claims are not moot because Defendant tendered only a conditional payment to Plaintiff after the filing of the present action and thus did not settle the breach of contract claim.  *Id.* at 18.

     In the Reply, Defendant asserts that overall, Plaintiff has failed to raise disputed issues of material fact, and therefore summary judgment is appropriate.  *Reply* [#34] at 1. Defendant again argues that Plaintiff conveyed an implied nonexclusive license to Defendant, and that the Court may determine based on the undisputed facts and parties'

conduct here that the license was granted. *Id.* at 4-5. Defendant argues that payment was a covenant and not a condition of any nonexclusive license because Colorado law disfavors conditions, there was no prior agreement regarding Plaintiff's fee for the Ad, and Plaintiff did not send an invoice until three months after the Ad aired. *Id.* at 6-7.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Fed. R. Civ. P. 56(c), summary judgment should enter if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). A defendant who moves for summary judgment on an affirmative defense "'must demonstrate that no disputed material fact exists regarding the affirmative defense asserted.'" *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)). Once the defendant makes this showing, "'the plaintiff must then demonstrate with specificity the existence of a disputed material fact.'" *Id.* If the plaintiff cannot so demonstrate, the affirmative defense bars the plaintiff's claims and the defendant is entitled to summary judgment. *Id.* The non-movant

must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).   Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.   *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).   The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

### III.  Analysis

To establish copyright infringement Plaintiff must prove (1) ownership of a valid copyright and (2) "copying of constituent elements of the work that are original." *TransWestern Pub. Co. LP v. Multimedia Mktg. Assocs., Inc.*, 133 F.3d 773, 775 (10th Cir. 1998) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).   The parties do not dispute that the Work at issue, the Ad titled "Indulge,'" was produced by Plaintiff and that Plaintiff possessed a valid copyright to the Ad. *Scheduling Order* [#24] at 4 (undisputed facts); *Compl., Attach. 1* [#1-1] at 1. Once Plaintiff has shown that it holds a valid copyright, it must next prove that Defendant unlawfully appropriated protected portions of the copyrighted work.   *Gates Rubber Co. v. Bando Chem. Indus. Ltd.,* 9 F.3d 823, 832 (10th Cir. 1993).   The Copyright Act provides that "anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a) . . . is an infringer of the copyright."   17 U.S.C. § 501(a).   Section 106 of the Act provides that "the owner of the copyright under this title has

the exclusive rights . . . in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly." 17 U.S.C. § 106(4).

## A.    Defendant's Implied License

Section 204(a) of the Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).  Section 101 of the Act defines "transfer of copyright ownership" to include exclusive licenses, but expressly excludes nonexclusive licenses. *See id.* § 101; *see Effects Assoc. v. Cohen,* 908 F. 2d 555, 558 (9th Cir. 1990).  Thus, even though section 204(a) invalidates any transfer of copyright ownership not in writing, section 101 explicitly removes a nonexclusive license from the section 204(a) writing requirement.  *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir. 1996).


Where an exclusive license exists, "the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others." *Shaver*, 74 F.3d 768 at 775.  By contrast, where a nonexclusive license exists, the creator or licensor of the work does not transfer ownership of the copyright to the licensee, but "simply permits the use of a copyrighted work in a particular manner."  *Id.*  In contrast to an exclusive license, a "nonexclusive license may be granted orally, or may even be implied from conduct."  *Id.* (quoting Melville B. Nimmer & David Nimmer, *3 Nimmer on Copyright,* § 10.03[A] at 10-40.1); *see also Effects*, 908 F.2d at 558. Further, the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement. *Shaver,* 74 F.3d at 775; *Effects,* 908 F.2d at

559.  Defendant asserts that it had an implied nonexclusive license to perform the Ad because: (1) Defendant requested that Plaintiff create a television advertisement for Defendant, (2) Plaintiff created the Ad for Defendant and delivered it to Comcast on behalf of Defendant, and (3) Plaintiff intended the performance of the Ad, as evidenced by its delivery of the advertisement to Comcast.  *Motion* [#32] at 7.

As a defense to copyright infringement, a defendant may assert an implied license "where one party created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it."  *Malibu Media, LLC.  v. Batz*, No. 12-cv-01953-WYD-MEH, 2013 WL 2120412, at *5 (D. Colo. Apr. 5, 2013) (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 25 (2d Cir. 2000)). While the Tenth Circuit has not yet decided the issue of an implied license in a copyright infringement case,[4] the District Court for the District of Colorado has cited the three-part test for an implied license as articulated by the D.C. Circuit: "an implied license will arise where (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work."  *Malibu Media*, 2013 WL 2120412, at *5 (quoting *Atkins v. Fischer,* 331 F.3d 988, 991-992 (D.C. Cir. 2003)).  This test was announced by the Ninth Circuit in *Effects Association v. Cohen*,

---

[4]  In the Response, Plaintiff argues  that the case law cited by Defendant in its Motion [#32] is not controlling because the cases are from other jurisdictions and therefore not binding on this Court.  *Response* [#33] at 13.  However, Plaintiff fails to present any alternative authority regarding implied nonexclusive licenses that could be binding on this Court.  *See id.*  The Court notes that while the Tenth Circuit has not decided the implied license issue, other decisions in the District of Colorado have cited the implied license standard announced by other circuits, and the Court does the same here.

where the court held that the plaintiff, a special effects company, which had created and delivered video footage at the request of the defendant film maker, had impliedly granted nonexclusive licenses to the film maker to incorporate special effects footage into the movie and to an entertainment company to distribute the movie.  908 F. 2d at 559.  The Court analyzes each factor of the implied license test below to determine whether the evidence, taken in the light most favorable to Plaintiff, demonstrates that Plaintiff granted Defendant an implied license to perform the Ad publicly.

### 1.      Whether Defendant Requested Creation of the Work

The undisputed facts show that Defendant requested that Plaintiff create an advertisement for Plaintiff. The parties do not dispute that the purpose of the conversation between Mr. Hupfer and Mr. Stanley when they met in October or November of 2013 was to discuss the production of a television advertisement for Defendant, and that Mr. Stanley showed Mr. Hupfer an estimate from a different company to produce an advertisement. *Motion* [#32] at 3; *Response* [#33] at 6; *Response, Attach. 1* [#33-1] at 18 (Hupfer Dep. at 35).  In the Response, Plaintiff argues that the estimate presented by Mr. Stanley was for "the creation of an ad *concept*," not necessarily a produced and ready-to-air television advertisement, but does not dispute that the two men discussed that Plaintiff would produce an advertisement for Defendant.  *Response* [#33] at 6.  Further, Mr. Stanley said that he showed Mr. Hupfer the estimate because he was "familiar with [Plaintiff's] work . . . [a]nd was looking to see if he could do something for me in the same budget."  *Response, Attach. 1* [#33-1] at 8 (Stanley Dep. at 11).  Mr. Hupfer's deposition supports the fact that the purpose of their meeting was to discuss Plaintiff's production of an advertisement for Defendant and that the two men agreed that Plaintiff would "produce a completely finished

spot for [Mr. Stanley] on spec," and that if Mr. Stanley did not like it, he would not pay for it, but if he did like it, he would pay for it and he could use it. *Id.* at 18  (Hupfer Dep. at 35).

For the first part of the test, the licensee's request that the licensor create a work need not be in writing, although it may be embodied in a written agreement.  *See Shaver,* 74 F.3d at 770 (architect, licensor, agreed in writing with an airport, licensee, to create schematic design drawings for a new airport building, at a contract price of $10,000 for his services).  However, in *Effects,* the court found the existence of an implied license where the licensor offered, in a short letter, to prepare special effects footage and the parties agreed to the deal orally, without discussing who would own the copyright in the footage. 908 F.2d at 556.  The Court therefore concludes that the parties' conduct here  meets the first part of the test, that the licensee requested the creation of the work.

## 2.    Whether Plaintiff Produced the Work and Delivered It to the Licensee

The undisputed facts show that Plaintiff produced the Work, the Ad titled "Indulge," and then delivered it to Comcast on behalf of Defendant. In the Motion, Defendant asserts that Plaintiff produced the copyrighted Work for Defendant titled "Indulge," Defendant approved the Work and reiterated its approval on December 12, 2013, and Plaintiff then delivered the Ad to Comcast for broadcast in order to meet the Comcast media purchase made on behalf of Defendant.  *Motion* [#32] at 3 (citing *Scheduling Order* [#24] at 4 (undisputed facts)).  Plaintiff does not dispute these facts in its Response. *Response* [#33] at 6.  While the guidance from other circuits on what precisely qualifies as "delivering" a work to the requestor or licensee is not clear, the Court can conclude that Plaintiff first

delivered the Ad to Defendant for approval and then to Comcast because Defendant had made a Comcast media purchase. *See John G. Danielson, Inc. v. Winchester-Covenant Props.,* 322 F.3d 26, 41 (1st Cir. 2003) (noting that courts considering the implied license issue [in the context of architecture] "quickly pass over the 'request' and 'delivery' issues to focus on manifestations of the architects' intent that plans may be used on a project without their involvement").   It is undisputed that Defendant reiterated its approval of the Ad on December 12, 2013, in an email to Plaintiff from Una Schade, the Marketing and Merchandising Manager for Defendant.   *Scheduling Order* [#24] at 4 (undisputed facts); *see also Am. Compl.* [#6] at 4.   The clear inference is that the Ad was delivered to Defendant in some capacity to facilitate its approval. Further, Plaintiff delivered the work to Comcast for broadcast in order to meet the Comcast media purchase made for Defendant.   *Motion* [#32] at 3.   Thus, the parties' conduct here meets the second part of the implied license test.   Plaintiff "created a work [i.e., the Ad] at [D]efendant's request and handed it over."   *Effects*, 908 F. 2d at 559.

### 3.   Whether Plaintiff Intended That Defendant Distribute the Work

The third part of the test is whether Plaintiff (the licensor) intended that Defendant (the licensee) distribute the Ad. "The touchstone for finding an implied license, according to this framework, is intent." *Danielson*, 322 F.3d at 40 (citing *Nelson-Salabes, Inc. v. Morningside Dev., LLC,* 284 F.3d 505, 515 (4th Cir. 2002)).   "Without intent, there can be no implied license." *Johnson v. Jones,* 149 F.3d 494, 502 (6th Cir. 1998).   Courts look to objective factors to determine a party's intent, including "deposition testimony and whether the copyrighted material was delivered 'without warning that its further use would constitute copyright infringement.'" *Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 956 (11th Cir.

2009) (quoting *Shaver*, 74 F.3d at 776); *see also Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) ("[c]ourts focus on objective evidence revealing the intent of parties to determine if an implied license exists, and this inquiry also reveals the scope of that license"). "The relevant intent is the licensor's objective intent at the time of creation and delivery of [the Work] as manifested by the parties' conduct." *Asset Mktg. Sys., Inc. v. Gagnon,* 542 F.3d 748, 756 (9th Cir. 2008) (citing *Effects*, 908 F.2d at 559 n.6 (noting that "every objective fact concerning the transaction" supported the finding that an implied license existed)). Some jurisdictions consider three factors in determining whether intent to grant a license exists:

> (1) Whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that the use of material without the creator's involvement or consent was permissible.

*Gagnon,* 542 F.3d at 756 (quoting *Danielson*, 322 F. 3d at 41). Regarding the first factor Courts have found that implied licenses existed, in the context of architecture, where architects were "hired for discrete tasks, with no indication of their further involvement in the project," rather than where architects were retained to develop a project to completion, suggesting that further use of their work without their involvement was impermissible. *Nelson-Sabales*, 284 F.3d at 516. Regarding the second and third factors, courts have found implied licenses to exist where no written materials required the creator's express permission to use the materials, and where the creator's conduct lacked a warning that the licensee's use of that material would be impermissible. *Gagnon,* 542 F.3d at 757 (noting that the creator/licensor "had to express an intent to retain control over the [software]

programs and limit AMS's license if he intended to do so").

Here, Plaintiff maintains that it submitted the Ad to Comcast "without knowledge of whether or not the ad was certain to run," and that Plaintiff did not have actual knowledge of the public performance of the Ad until February 2014, after the Ad had been run on Comcast almost six hundred times in December 2013. *Response* [#33] at 3. However, actual knowledge and certainty is not required by the test for whether an implied license was granted by a creator/licensor. Rather, the Court must ask whether "the totality of the parties' conduct indicates an intent to grant such permission [for an implied license]." *Estate of Hevia v. Portrio Corp.,* 602 F.3d 34, 41 (1st Cir. 2010) (quoting *Nimmer on Copyright* § 10.03[A][7] at 10-42 (2000)).

In his deposition, Mr. Hupfer states that when a media buyer, such as EMICO, contacts him saying that they are going to try and run an ad on a certain date, and that they have a buy set up for that date:

> That doesn't necessarily mean that's my commercial that's going to be used for that buy, but I'm hoping it is so I can get it rushed and in place to make sure that it's where it needs to go before they pull that trigger on it. That's the other thing; of course I want my spot to be done, so the quicker mine gets there, that keeps the dealership from using maybe an older spot that they produced earlier in the year or somebody else.

*Response, Attach. 1* [#33-1] at 15 (Hupfer Dep. at 22). Mr. Hupfer also states that, "[he] had no idea if that was going to be [his] spot running or not. But most of the time with my clients, I know we are producing a commercial spot for this client that's going to air during this month, and this is what it's going to be." *Id.* at 19 (Hupfer Dep. at 59). Further, when asked whether he created the Ad specifically for Defendant, Mr. Hupfer replied:

> Well, it's a non-exclusive license, so theoretically, of course, I could take that and stamp it with a different dealership and sell it to different dealerships

across the country if I wanted to. But, of course, this intent was originally to satisfy Larry and show him my work and get him to give me praise and we'd have a good working relationship together.

*Id.* at 20 (Hupfer Dep. at 76).  Mr. Hupfer's testimony shows that while he may not have been absolutely certain whether the Ad would run, or that the Ad had run, until he received notice of it in February, he clearly hoped that Defendant would use his Ad and create a good working relationship.

Further, emails and testimony from a Comcast employee show that Mr. Hupfer was aware that his Ad would likely be aired on Comcast in the immediate future because Defendant had purchased a media buy from Comcast for December and because Comcast contacted Mr. Hupfer about fixing technical details necessary to run the Ad and for it to display properly. Mr. Hupfer communicated with Defendant's media buyer to determine whether Defendant had purchased a media buy yet.  On December 4, 2013, Mr. Hupfer emailed Ms. Mansi of EMICO Media asking, "Natalie, does Larry [i.e., Mr. Stanley] have a buy for TV this month? I'm wrapping up a build on the spec spot for him today but I haven't heard from him regarding a deadline for a finished spot." *Motion, Attach. 4* [#32-4] at 3. Ms. Mansi replied, "He has a Comcast buy for December.  Starts next week, is that doable for you?"  *Id.* at 2.  When asked about the purpose of his communication with Ms. Mansi, Mr. Hupfer said that "she usually answers her phone or answers emails fairly quickly.  My hope, again, at this point was that they're going to take my spot and they're going to use it." *Motion, Attach. 2* [#32-2] at 6 (Hupfer Dep. at 57).  Gina Spicola ("Spicola"), a Comcast employee, testified regarding the sequence of events before the Ad was aired. When asked about her involvement with the Ad that was run by Defendant in December 2013, Ms. Spicola responded that she "received a buy from EMICO Advertising. The spot was

uploaded, and we aired the spot that was uploaded." *Motion, Attach. 3* [#32-3] at 3 (Spicola Dep. at 9). When asked who uploaded the spot, she replied, "[i]t was Mike [i.e., Mr. Hupfer] at Millennium [i.e., Plaintiff]." *Id.*

The Ad was delivered to Comcast on December 10, 2013, as evidenced by an email to Ms. Spicola confirming that the Ad, titled "Endulge [sic] - December 2013" was electronically delivered by Plaintiff's production department to Comcast on behalf of the client "Sonic Automotive" [i.e., Defendant]. *Motion, Attach. 5* [#32-5] at 12-13. On December 11, 2013, Ms. Spicola contacted Mr. Hupfer to confirm that the way the "HD version" and the "SD version" would appear on air was correct, and forwarded Mr. Hupfer a message from Master Control at Comcast showing how both versions of the Ad would appear on air. *Id.* at 10-11. Mr. Hupfer responded that the SD version looked skewed, and Ms. Spicola and Master Control communicated, with Mr. Hupfer copied on the emails, to tell Mr. Hupfer how to solve the problem by uploading another SD spot. *Id.* at 6-9. The email thread ends with Mr. Hupfer agreeing to make some changes and send another file. *Id.* at 2. The next day, December 12, 2013, Plaintiff received approval from Defendant for the Ad in the above-mentioned email from the Marketing and Merchandising Manager of Defendant. *Scheduling Order* [#24] at 4 (undisputed facts).

Viewed objectively, Plaintiff's conduct demonstrates that it intended for the Ad to be aired on Comcast in the slot and time purchased by EMICO Advertising on behalf of Defendant. Plaintiff electronically delivered the Ad to Comcast after confirming that Defendant had purchased an advertising buy for December of 2013, and then communicated with Comcast regarding the technical specifications for the Ad, and how the Ad would look *on air.* Despite Plaintiff's assertion that it was unsure whether the Ad would

actually be aired, it would defy logic to conclude that Plaintiff did not *intend* for the Ad to be aired based on Plaintiff's conduct and Mr. Hupfer's deposition testimony.

Further, there is no indication in the record that Plaintiff warned Defendant that further use of the Ad would constitute copyright infringement.  When Mr. Stanley approved the Ad, there was no discussion with Plaintiff about the need for a copyright license to run it, and Mr. Stanley never had any discussion with Mr. Hupfer "about the need for a copyright license to use any of his produced material." *Response, Attach. 1* [#33-1] at 11 (Stanley Dep. at 20).  In the Motion, Defendant asserts that Mr. Hupfer and Mr. Stanley did not discuss Plaintiff's copyright in any advertisement it would produce or any limitations on Defendant's right to perform the advertisement, and Plaintiff does not dispute this fact. *Motion* [#32] at 3; *Response* [#33] at 6.  Therefore, the Court concludes that "the copyrighted material was delivered without warning that its further use would constitute copyright infringement."  *Wilchombe,* 555 F.3d at 956 (internal quotations omitted). Therefore, the undisputed facts show that Defendant requested that Plaintiff create the Ad, Plaintiff created the Ad and delivered it to Defendant, and Plaintiff intended the distribution of the Ad via Comcast in an advertising buy for December 2013.

The Court must address a few additional issues raised by Plaintiff. Plaintiff argues that it could not have granted a nonexclusive license to Defendant because Plaintiff's "original intent was to create an advertisement to be used exclusively by [Defendant] and for which [Plaintiff] would have conveyed an exclusive license to [Defendant] in writing," and that Plaintiff's "intent was to create Indulge specifically for [Defendant]." *Response* [#33] at 10 (citing *Response, Attach. 1* [#33-1] at 39 (March 14 invoice from Plaintiff to Defendant), 20-21 (Hupfer Dep. at 76-77)).  However, the undisputed evidence contradicts

this argument.  When asked if he created the Ad specifically for Defendant, Mr. Hupfer replied, "Well, it's a non-exclusive license, so theoretically, of course, I could take that and stamp it with a different dealership and sell it to different dealerships throughout the country," and "at the time, I was creating it for them [Defendant]; but, obviously, I would have the right to spread it out."  *Response, Attach. 1* [#33-1] at 20 (Hupfer Dep. at 76).

Plaintiff argues that "whether a non-exclusive, implied license existed between the parties is a genuine issue of material fact which requires a determination by the Court and therefore precludes summary judgment."  *Response* [#33] at 11.  The Court disagrees. Many circuit court decisions regarding the existence of an implied license, including two cited by Plaintiff, uphold a district court's grant of summary judgment regarding the implied license issue.  *See Shaver,* 74 F.3d at 779 (affirming the summary judgment ruling of the district court that an implied nonexclusive license existed); *see also Effects,* 908 F.2d at 559 ("We affirm the district court's grant of summary judgment" in favor of the defendants based on an implied license defense.).  Plaintiff also argues that the cases cited by Defendant are distinguishable from the facts in this case, focusing on *Graham v. James, Effects Association. v. Cohen,* and *I.A.E. v. Shaver,* asserting that in those cases "either the existence of the implied license was not in dispute or the court relied on the district court's finding of facts in making its determination that a non-exclusive, implied license existed." *Response* [#33] at 13-15.  However, Plaintiff fails to present any alternative authority regarding implied nonexclusive licenses that is  more analogous to the facts of this case.  *See id.*  The Court discusses below how *Graham*  is indeed distinguishable from the facts of this case.  However, in both *Effects* and *Shaver,* the existence of an implied license was certainly in dispute, which is why the courts in those cases applied the three-part test

to determine whether one existed.

Plaintiff further argues that "[i]f the Court determines that a non-exclusive license existed, the validity of such will turn on whether Defendant's requirement to pay was a condition or covenant of the purported oral agreement." *Response* [#33] at 12 (citing *Graham v. James,* 144 F.3d 229, 236 (2d Cir. 1998)).  Plaintiff argues that Mr. Hupfer's statement during his discussion with Mr. Stanley regarding the creation of the advertisement, "if you like it, you pay for it, you can use it," demonstrates that payment for the Ad was a condition required for proper transfer of any implied license to Defendant. *Response* [#33] at 12.   However, Plaintiff misunderstands the basis for finding an implied license in this case.  The Court concludes that an implied license for Defendant to air the Ad existed by virtue of the parties' conduct leading up to the delivery and distribution of the Ad via Comcast. Nonexclusive licenses "*may* be granted orally, or *may even be implied from conduct.*" *Latimer,* 601 F.3d at 1235 (quoting *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753 (11th Cir. 1997)) (emphasis added).  Indeed, the test for determining whether an implied nonexclusive license exists focuses on a series of  actions taken by the parties involved that indicate whether the creator, the licensor, has granted the licensee a license to use copyrighted material in a particular manner. *See Shaver,* 74 F.3d at 776 (stating that courts "universally have recognized that a nonexclusive license may be implied *from conduct* . . .   when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work") (emphasis added).

Here, the Court has determined that the parties' conduct satisfies all three parts of

that test and thus, Plaintiff granted Defendant an implied license. The analysis rests not on what was orally agreed to by the parties, but rather, what was implied by their conduct. The court in *Effects* used the same logic: "although [the plaintiff] never gave [defendant] a written or oral license, [plaintiff's] conduct created an implied license to use the footage." 908 F.2d at 558.   In *Graham,* by contrast, the court did not find that a nonexclusive license was implied by the parties' conduct because the court did not conduct an implied license analysis. *See Graham,* 144 F.3d at 235-236.   There, the court affirmed the finding of the district court that the plaintiff had entered into a licensing agreement with defendant for defendant to pay plaintiff a set amount for each CD release containing the copyrighted software and a set amount for each CD sold, pursuant to an oral agreement. *Id.* Thus, in *Graham,* the court found that a nonexclusive licensing agreement existed between the parties by virtue of their oral agreement, not an implied license created by the parties' conduct.   *See id.*   In this case, as in *Effects*, the parties' conduct, rather than their oral agreement, created an implied nonexclusive license.   Thus, because the parties' conduct, rather than their oral agreement, created the implied license in this case, any requirement to pay for the Ad expressed in their oral agreement is separate from the existence of the implied license allowing Defendant to distribute the Ad.

In any event, the Court in *Graham* found that the license in that case was not terminated by the defendant's nonpayment of royalties and removal of a copyright notice because those terms were covenants and not conditions under New York law. *Graham*, 144 F.3d at 237.   The *Graham* court further found that even if the defendant had materially breached the licensing agreement, the license did not automatically terminate and the plaintiff was entitled to rescission, which did not occur automatically without some

affirmative steps by plaintiff. *Id.* at 283. The court then vacated the district court's award of copyright infringement because a nonexclusive license existed and had not been rescinded. *Id.* Colorado, like New York, favors covenants, or promises, rather than conditions when interpreting provisions of a contract. "If there is any doubt as to the parties' intention, we interpret a clause in a contract as a promise rather than a condition." *Main Elec., Ltd. v. Printz Servs. Corp,* 980 P.2d 522, 526 (Colo. 1999) (en banc) (citing *Charles Illfeld Co. v. Taylor,* 397 P.2d 748, 750 (Colo. 1964)).

Therefore, the Court finds that the implied nonexclusive license in this case was not invalidated by any failure to pay for the Ad or delay in payment for two reasons. First, the existence of the license rests on the parties' conduct and objective evidence of intent, rather than any oral agreement.  The Court finds that any oral agreement purportedly reached between Mr. Hupfer and Mr. Stanley at their meeting in November 2013 pertains to the issue of whether a contract existed between the parties for payment, not the existence of an implied license. Mr. Hupfer and Mr. Stanley did not discuss copyright or license issues either at that meeting or when Mr. Stanley approved the Ad.  Mr. Stanley never had any discussion with Mr. Hupfer "about the need for a copyright license to use any of his produced material."  *Response, Attach. 1* [#33-1] at 11 (Stanley Dep. at 20). Similarly, in *Effects,* the court found that an implied license existed based on the parties' conduct, even where the parties had reached an oral agreement regarding a specific payment amount, but "no one said anything about who would own the copyright in the footage."  908 F.2d at 556.  In *Effects,* the oral agreement between the parties did not supersede or preclude the implied license created by the parties' conduct because the oral agreement did not address copyright or licensing in any way.  *See Effects,* 980 F.2d at 556,

559.  The same is true here.  Even if the Court sought to rely instead on the parties' purported oral agreement from the November 2013 meeting, that meeting did not address licensing or copyright issues.  Therefore, the Court must look to the parties' conduct to determine whether Plaintiff granted Defendant an implied license to air the Ad.

Second, even assuming that an agreement to pay was included in the license agreement between the parties, payment would likely be a covenant (or promise) rather than a condition, and the non-fulfillment of that covenant would entitle Plaintiff to rescind the license.  *See Graham,* 144 F.3d at 283.  Plaintiff could not have taken any action to rescind the license on the grounds of nonpayment until at least March 4, 2014, when Mr. Hupfer spoke to Mr. Harvey regarding the Ad, or March 14, 2014, when Plaintiff first sent an invoice for the Ad to Defendant. *See Scheduling Order* [#24] at 4 (undisputed facts). There is no evidence in the record to show that Plaintiff took any action before that time to request payment from Defendant.  In fact, when Defendant approved the Ad in December 2013, there was no discussion with Plaintiff regarding the cost of the Ad.  *Response, Attach. 1* [#33-1] at 19-20.  Plaintiff could not have been aware of nonpayment by Defendant unless Plaintiff had first requested payment from Defendant. The record indicates that the only public performance or distribution of the Ad by Defendant occurred in December 2013, when the Ad was aired on Comcast 592 times, as evidenced by the Comcast invoices for the Ad. *See Scheduling Order* [#24] at 4 (undisputed facts).  The parties have submitted no evidence to show that the Ad was performed or distributed after that time.  Thus, any distribution by Defendant necessarily took place before Plaintiff would have been able to take any action to rescind the license due to nonpayment.  The undisputed evidence demonstrates that Plaintiff knew it was creating the Ad to be aired in

December, and "[w]ithout any prior agreement as to the fee Plaintiff would charge and without an invoice until approximately three months following performance, payment could not be a condition precedent" to Defendant's license to perform the Ad. *Reply* [#34] at 7.

Accordingly, for the reasons stated above, the Court concludes that Defendant requested that Plaintiff create the Ad, Plaintiff created the Ad and delivered it to Defendant, Plaintiff intended the distribution of the Ad via Comcast in an advertising buy for December 2013, and Plaintiff thus granted Defendant an implied nonexclusive license to use the copyrighted material, the Ad, in that manner. *See Effects,* 908 F. 2d at 559; *Shaver,* 74 F.3d at 776.  This implied license is an affirmative defense to the claim of copyright infringement, and thus Plaintiff may not assert a claim of copyright infringement against Defendant.  *Shaver,* 74 F.3d at 775; *Effects,* 908 F.2d at 559.  Accordingly, the Motion [#32] is **granted** to the extent it requests judgment in favor of Defendant on the copyright infringement claim, and  the Court **orders** the entry of summary judgment in favor of Defendant on the copyright infringement claim.[5]

## B.   Supplemental Jurisdiction

The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for breach of contract and unjust enrichment. "If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman v. West High Sch.,* 132 F.3d 542, 549 (10th Cir. 1997).  The Court has jurisdiction over this case pursuant to 17

---

[5]  Because the Court has determined that judgment will enter in favor of Defendant on the copyright infringement claim, the Court need not address Defendant's argument that Plaintiff is estopped from claiming infringement.

U.S.C. § 101, et seq., and  28 U.S.C. § 1338(a). The Court thus has federal question jurisdiction over the case. It does not also have diversity jurisdiction over the case pursuant to 28 U.S.C. § 1332.  *See Am. Compl.* [#6] at 1.  Because the Court has concluded above that judgment should enter in favor of Defendant on the copyright infringement claim, only Plaintiff's state law claims for breach of contract and unjust enrichment remain, and the Court may exercise jurisdiction over those claims pursuant to  28 U.S.C. § 1367(a). However, the Court may decline to exercise supplemental jurisdiction over a state law claim where it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  Federal courts generally decline to exercise supplemental jurisdiction in such cases because "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Ball v. Renner,* 54 F.3d 664, 669 (10th Cir. 1995).  Colorado law recognizes "if a plaintiff asserts all of his or her claims, including state law claims, in federal court, and the federal court declines to exercise supplemental jurisdiction [over the state claims], the plaintiff may re-file those claims in state court." *Dalal v. Alliant Techsystems, Inc.,* 934 P.2d 830, 834 (Colo. App. 1996) (relying on 28 U.S.C. § 1367(d), which states that the period of limitation for a state claim is tolled while a claim is pending in federal court and for thirty days after it is dismissed unless state law provides for a longer tolling period).

"When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims." *Smith v. City of Enid ex rel. Enid City Comm'n,* 149 F.3d 1151, 1156 (10th Cir. 1998).   It is proper for a federal court to decline to exercise supplemental jurisdiction over state law claims where the court's basis for exercising jurisdiction over the case was pursuant to a federal question on

which the court grants summary judgment, and where the court would not have diversity jurisdiction over the parties. *See Koch v. City of Del City,* 660 F.3d 1228, 1248 (10th Cir. 2011) (in a § 1983 action by an individual plaintiff against a city where the district court granted summary judgment and the only remaining claims were state law claims for assault, battery, and false arrest, the court "did not abuse its discretion by declining to exercise supplemental jurisdiction over these claims"); *Gaston v. Ploeger,* 297 F. App'x 738, 746 (10th Cir. 2008) ("After the district court granted summary judgment in favor of [defendant] there were no remaining federal question claims in the case, and plaintiff has never sought to establish diversity of citizenship jurisdiction with regard to her state-law claims. Under those circumstances, 28 U.S.C. § 1367(c)(3) expressly permits a district court to decline to exercise supplemental jurisdiction over any remaining state-law claims, and we have repeatedly recognized that this is the preferred practice."); see also Sportsmans Warehouse, Inc. v. Fair, 576 F. Supp. 2d 1175, 1186 (D. Colo. 2008) (dismissing the remaining state law defamation claim after granting summary judgment on the federal copyright question, even where the parties were residents of different states and therefore diverse for the purposes of  28 U.S.C. § 1332, but where it appeared that the amount in controversy would have been insufficient to confer diversity jurisdiction on the court).  Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for breach of contract and unjust enrichment and those claims are accordingly **dismissed without prejudice**.[6]

## C.    Award of Attorneys' Fees

---

[6]    The Court declines to exercise supplemental jurisdiction over state law claims by dismissing those claims without prejudice.  *See Bauchman,* 132 F.3d at 549.

Defendant argues that it is entitled to an award of attorneys' fees because "[t]he prevailing party in a copyright action is entitled to an award of attorneys' fees." *Motion* [#32] at 10 (citing 17 U.S.C. § 505; *Sherry Mfg. Co. v. Towel King of Fla., Inc.,* 822 F.2d 1031, 1035 (11th Cir. 1987)). However, Defendant has not filed "a summary of relevant qualifications and experience," and "a detailed description of the services rendered, the amount of time spent, the hourly rate charged, and the total amount claimed," or a supporting affidavit as required by the local rules. *See* D.C.COLO.LCivR 54.3. Therefore, Defendant's request for attorneys' fees is **denied without prejudice**.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#32] is **GRANTED in part** and **DENIED in part**. The Motion is **granted** to the extent that summary judgment shall **enter** in favor of Defendant and against Plaintiff with respect to the claim of copyright infringement.  The Motion is further **granted** to the extent that Plaintiff's claims for breach of contract and unjust enrichment are **dismissed without prejudice**.  Defendant's request for attorneys' fees is **denied without prejudice** for failure to comply with  D.C.COLO.LCivR 54.3.  The Clerk of Court is directed to **close** this case after entry of Final Judgment.


Dated:  April 20, 2015              BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge